UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| HAYDEN GONZALES, | |
| Plaintiff, | |
| v. | Civil Action No. |
| MAINE VETERANS' HOME, | |
| Defendant. | |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Hayden Gonzales, by and through undersigned counsel, and complains against the Defendant, Maine Veterans' Home ("MVH"), as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act ("Rehab Act"), 29 U.S.C. §§ 701 *et seq.*, the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.,* the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 et seq., as enforced through the MHRA; and the Maine Family Medical Leave Requirement Act ("FMLR"), 26 M.R.S. §§ 844 *et seq*

2.      Gonzales is a legal resident of the United States residing in the Town of Canton, County of Androscoggin, State of Maine.

3.      MVH is a public, not-for-profit organization created by the 108th Maine Legislature in July 1977.

1

4.      MVH had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5.      At all relevant times, MVH has operated a "program or activity receiving federal financial assistance" within the meaning of the Rehab Act.

6.      By way of example, MVH received federal funding including Medicare, Medicaid, and funding from the federal Department of Veterans Affairs.

7.      This Court has subject matter jurisdiction over Gonzales' federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

8.      On or about September 14, 2017, Gonzales filed a timely Complaint/Charge of Discrimination against MVH alleging unlawful disability discrimination, retaliation, and whistleblowers' retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

9.      On or about April 18, 2018, the MHRC issued a Notice of Right to Sue with respect to Gonzales' state law claims.

10.     On or about April 20, 2018, the EEOC issued a Notice of Right to Sue with respect to Gonzales' federal law claims.

11.     Gonzales has exhausted his administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

<u>JURY TRIAL REQUESTED</u>

12.     Gonzales requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

13.     MVH provides long-term care and rehabilitative services to military veterans.

14.     MVH has facilities in six locations throughout the State of Maine including one located at 477 High Street in South Paris ("MVH South Paris").

15.     Gonzales was employed at MVH South Paris beginning on August 3, 2015 as a Maintenance Technician II.

16.     Gonzales worked full time, 40 hours per week, plus overtime. His final rate of pay was $13.84 per hour.

17.     Scott Tabb was the Maintenance Supervisor when Gonzales was hired. After he left, Gonzales was supervised by Aaron Preo, Facility Manager.

18.     Joel Dutton was the Administrator of MVH South Paris until he was replaced by Brad Peck.

19.     Lisa Legendre was the Human Resources Manager for MVH South Paris.

20.     Kenneth W. Hann was the Director of Human Resources for MVH.

### Maintenance Technician II

21.     Gonzales' job title was Maintenance Worker II.

22.     The job description for Maintenance Worker II provides the following summary of the position:

> The Maintenance Worker II performs maintenance and repair work to buildings, grounds and equipment, in order to provide a safe, functional, sanitary and comfortable environment for the residents, employees and the public. Also assists Maintenance Supervisor in meeting environmental care compliance with all federal and state regulations.

23.     The job description for Maintenance Worker II provides the following summary of the physical demands of the position:

> Moderate physical demands including standing, walking, lifting, repeated bending and twisting of the waist, some prolonged work in awkward positions.  Must be able to lift 50 pounds.

24.     The job did not require heavy work.

25.     The job did not require lifting up to 100 pounds.

26.     The job did not require carrying objects weighing up to 50 pounds.

27.     Maintenance workers did not "touch residents," that is, they did not perform job duties that involved caring for residents.

Job Performance

28.     Gonzales received a 90-day appraisal on December 17, 2015. His job performance and attitude were rated fully satisfactory by Tabb. The appraisal reads, in part: "Hayden's strengths are his attention to detail and his positive attitude toward staff and residents."

29.     Gonzales received his first annual review on May 20, 2016 from Tabb, approved by Dutton. Gonzales was rated as "fully meets expectations" or "performs above expectations" in all areas.

30.     Tabb commended Gonzales for his skills and for doing a good job. Tabb commented that Gonzales was courteous and respectful toward the residents and their family members.

31.     Tabb told Gonzales that he appreciated Gonzales' flexibility in covering extra hours.

32.     Gonzales was on a forced medical leave of absence (see below) when his second annual review was due.

33.     Gonzales was handed a copy of his second annual review on July 5, 2017. The review was unfair and he refused to sign it.

Disability/Serious Health Condition, Need for Time Off, Unlawful Medical Inquiries

34.     Gonzales was just 39 years old in 2017 but he had had intermittent back pain for a number of years. The flares occurred three or four times a year, more or less.

35.     When Gonzales had flares, his doctor gave him an osteopathic manipulative treatment ("OMT") to relieve the pain. Gonzales needed a few days off from work after his back was manipulated.

36.     Gonzales informed MVH about his back impairment and the impact it had on his health including his ability to bend, lift and work.

37.     Gonzales missed work on Wednesday, March 29, 2016 due to a flare of his back impairment.

38.     Gonzales missed work again due to his back impairment on Monday through Wednesday, August 1, 2 and 3, 2016. (He left work early on the 1st.)

39.     On about August 11, 2016, Gonzales requested that MVH provide him with intermittent leave under the FMLA after Gonzales aggravated his back impairment at work.

40.     On August 12, 2016, Legendre faxed FMLA forms to Julie Wilson, FNP at North Bridgton Family Practice. Ms. Wilson is Gonzales' primary care provider and he refers to Ms. Wilson as his "doctor".

41.      Legendre addressed the fax to Dr. Julie Wilson, MD.

42.     On August 24, 2016, Gonzales' osteopathic doctor, Craig Smith, DO, faxed a note to MVH stating that Gonzales would be out of work until August 29 due to his back, at which time Gonzales could return to work without restrictions.

43.     On August 29, 2016, MVH called North Bridgton Family Practice to check on the status of Gonzales' FMLA certification.

44.     MVH was told that Gonzales had an appointment to discuss it with his provider on August 31, 2016.

45.     On August 31, 2016, at 1:07 PM, North Bridgton Family Practice faxed a completed certification form back to MVH, signed by Ms. Wilson. A correction was added the same day at 3:38 PM.

46.     One of the questions on the FMLA Certification form was, "Is the employee unable to perform any of his/her job functions due to the condition: __No __Yes." Ms. Wilson checked "yes" initially but changed her answer to "no" and added, "As long as the patient continues with current care, receives OMT back adjustments every 3 months currently – he can perform job duties without restrictions."

47.     MVH's records show that Gonzales missed eleven days of work in August 2016, which is more than Gonzales needed to miss because of his back condition. Gonzales tried to work on some of those days but his supervisor Tabb sent Gonzales home because Gonzales did not have a doctor's note or because the doctor's note did not specifically say that Gonzales did not have work restrictions.

48.     On the FMLA Certification form, Ms. Wilson certified that Gonzales had intermittent back pain with flares that was ongoing and managed with rest, OMT, and medications.

49.     She also indicated that Gonzales was being referred to a specialist.

50.     She indicated that Gonzales needed one to two days of rest intermittently when he had flares.

51.     Ms. Wilson indicated that Gonzales was able to perform his job duties without restrictions as long as Gonzales continued with his current treatment plan.

52.     After receiving the completed FMLA certification, Legendre called North Bridgton Family Practice asking them to schedule his three-month appointments in advance so that she could put it on the schedule.

53.     Upon information and belief, North Bridgton Family Practice told Legendre that her request was inappropriate.

54.     MVH approved Gonzales' request for intermittent FMLA on September 13, 2016.

55.     Two months later, Gonzales had another flare of back pain and could not work from November 16 through 21, 2016.

56.     Dr. Smith wrote a note on the 16th stating that Gonzales was seen that day for treatment of his back.

57.     Ms. Wilson faxed a note to MVH on Monday, November 21, 2016 stating that Dr. Smith treated Gonzales with OMT on the 16th and that he could not work on the 17th and 18th and was cleared to return to work without restrictions as of the 21st.

58.     On November 28, 2016, Legendre wrote a letter to Dr. Smith asking for more information.

59.     Ms. Legendre's inquiry violated the MHRA and the ADA, both of which prohibit employers from making inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability, unless the examination or inquiry is shown to be job-related and consistent with business necessity.

60.     Questions that Legendre asked that are not job related or consistent with business necessity and violate the ADA and MHRA include (a) an actual diagnosis, (b) whether or not Gonzales had been seen by a specialist, and (c) if so, did the specialist have an opinion about Gonzales' ability to work.

61.     Ms. Legendre's request for an actual diagnosis also violated the FMLA.

62.     The FMLA Certification form published by the U.S. Department of Labor does not require that a diagnosis be provided. The medical facts that may be requested include information on symptoms, doctor's visits, or a diagnosis.

63.     Whether a diagnosis is included in the certification form is left to the discretion of the health care provider.

64.     An employer may not reject a complete and sufficient certification because it lacks a diagnosis. See 29 C.F.R. 825.306.  https://www.dol.gov/whd/fmla/employerguide.pdf.

65.     On December 14, 2016, Ms. Wilson submitted a new FMLA certification form that included some additional information. She indicated that Gonzales was a new patient as of June 11, 2014 and that his back impairment was present at that time. She indicated that Gonzales would need intermittent leave about every two to three months but noted that the frequency of his flares was unpredictable. She also wrote, "history of specialty referral (9/16) surgery not warranted. Recommended PT, NSAIDS and continue with described plan."

66.     On December 22, 2016, counsel for MVH wrote to Dr. Smith directly to request information about Gonzales.

67.     Defendant's counsel wrote that he did not wish to receive another report from Ms. Wilson.

68.     Ms. Wilson was Gonzales' primary care provider who happens to be a nurse practitioner.

69.     Counsel for MVH's request violated the FMLA which states that the FMLA certification must be completed by a "health care provider" which is defined to include a nurse practitioner.

70.     Counsel for MVH's request also violated the FMLA because an attorney for an employer is not included as an acceptable employer representative to make contact with an employee's health care provider for purposes of the FMLA.

71.     Counsel for MVH asked again for Gonzales' "actual medical diagnosis" and whether the specialist had recommended any medical procedure to improve or resolve Gonzales' condition.

72.     These requests went beyond what can be required and requested under the FMLA and FMLR and violated those statutes.

73.     These requests also violated the medical examination provisions of the ADA and MHRA as the requests were not job related or consistent with business necessity.

74.     On January 4, 2017, a letter from Dr. Smith was faxed to MVH along with an MRI report of Gonzales' lower back and a record of Gonzales' consult with neurologist John Hall, MD, in June 2015. Gonzales felt that his job was threatened and was willing to provide this additional information in an effort to keep his job.

75.     Dr. Smith noted that the MRI showed that Gonzales had L3/L4/L5 facet arthrosis of his lumbar spine. Dr. Smith explained that this results in mechanical, lumbar spine pain that is exacerbated when Gonzales lifted excessively.

76.     Dr. Smith informed MVH that Gonzales had been seen by a pain specialist and a neurologist, both of whom recommended that Gonzales avoid overuse or heavy lifting and relative rest when his back was sore.

77.     Dr. Smith requested that MVH direct future correspondence to Ms. Wilson because she was Gonzales' primary care provider.

78.     On February 8, 2017, Gonzales' back hurt all day at work beginning from the time he got out of his car.

79.     Gonzales' supervisor sent him to Concentra, the company's medical provider. Gonzales was found to be suffering from flu-like symptoms which caused body aches and back symptoms. He was prescribed Tamiflu to treat the flu and referred to his personal medical providers.

80.     On February 10, 2017, Ms. Wilson faxed a note to MVH that Gonzales should be excused from work from February 9 through 17, 2017.

81.     On February 15, 2017, Dr. Smith faxed a note to MVH letting them know that Gonzales was seen that day for an adjustment and because he was sick with the flu.

82.     On March 14, 2017, Ms. Wilson faxed another FMLA certification to MVH at 8:35 AM. She indicated that she had treated Gonzales' back impairment on February 15, February 23 and again on March 10, 2017. She wrote that Gonzales' flares might occasionally require him to miss up to one week of work because it was not always possible to schedule Gonzales for OMT right away when he had a flare.

83.     Ms. Wilson checked "no" in response to the question, "Is the employee unable to perform any of his/her job functions due to the condition," and listed lifting, bending, twisting, and awkward positioning as the job functions.

84.     Legendre alleges that she took Ms. Wilson's notation to mean that Gonzales was presently unable to work; this was incorrect.

85.     When Ms. Wilson learned about Ms. Legendre's misunderstanding, Ms. Wilson faxed a corrected copy to MVH at 11:05 AM. Ms. Wilson checked "yes" in response to the question, "Is the employee unable to perform any of his/her job functions due to the condition"

and erased the reference to lifting, bending, twisting, and awkward positioning as the job functions.

86.     On the revised copy of the FMLA paperwork, Ms. Wilson also wrote "update [question] 3 answered no originally - answered as though it was during a flare," referring to the answer to the question regarding the employee's ability to perform his/her job functions due to the condition.

87.     When MVH received the corrected copy, it excluded Gonzales from work at MVH.

88.      Gonzales explained to Legendre, Tabb and Dutton that his flare had subsided and that he was able to work. They told Gonzales that he was a hazard and a liability and put him on medical leave until further notice.

89.     MVH forced Gonzales out of work on March 15, 2017 and did not let him return until June 12, 2017.

90.     On March 16, 2017, Ms. Wilson wrote a letter reiterating information that she and Dr. Smith had already provided to MVH. She wrote,

> "When [Hayden] is not experiencing flares he is able to work without restrictions. I do not feel he needs further evaluation at this time as his symptoms have not changed."

91.     On March 28, 2017, Legendre asked Dr. Alan Bean with Raymond RediCare to provide a second opinion about Gonzales' request for intermittent FMLA, his need for work restrictions, and how long he would need to be accommodated. Legendre wrote that the reason for making the request is that MVH had received conflicting notes and documents from Gonzales' medical providers and that his providers had listed "some fairly signification restrictions," which is untrue.

92.     The FMLA Regulations do permit an employer to contact an employee's health care provider for purposes of clarifying and authenticating a fitness-for-duty certification.

93.     MVH did not seek clarification or authentication from any of Gonzales' health care providers on or after March 14, 2017.

94.     The FMLA Regulations prohibit employers from seeking second or third opinions on a fitness for duty certification.  29 C.F.R. §825.312(b).

95.     The FMLA Regulations also prohibit employers from seeking second or third opinions on recertifications of FMLA leave with the exception of annual FMLA certifications. 29 C.F.R. §825.308(f).

96.     MVH had no basis to seek additional information regarding Gonzales' medical condition in March 2017.

97.     MVH violated the FMLA when it required a second opinion about Gonzales' FMLA request.

98.     MVH also violated the medical examination provisions of the MHRA and ADA by requiring Gonzales to undergo a medical examination by Dr. Bean.

99.     The FMLA Regulations prohibit an employer from delaying an employee's return to work after the employee's health care provider has certified the employee's ability to return to work.  29 C.F.R. §825.312(b)&(c).

100.    MVH violated the FMLA when it excluded Gonzales from work from March 14, 2017 through June 12, 2017.

101.    Gonzales agreed to be assessed, and was assessed, by Dr. Bean on Thursday, April 6, 2017.

102.    Dr. Bean provided his opinion to MVH after seeing Gonzales on April 6, 2017.

103.     Dr. Bean opined that Gonzales did not have a heighted risk for discogenic injury; that Gonzales' condition was uncomfortable but not "dangerous"; and that Gonzales' request for intermittent FMLA for his condition was appropriate. Dr. Bean recommended that Gonzales be limited to lifting 50 pounds at work and that bending and twisting should be kept to a minimum frequency. Dr. Bean opined that Gonzales should be able to perform all of his routine work activities on a full-time basis.

104.     It is apparent that MVH was hoping for a different answer from Dr. Bean.

105.     Even after MVH completed its unlawful medical examination of Gonzales by Dr. Bean and he cleared Gonzales to return to work, MVH still refused to permit Gonzales to return to his job.

106.     On May 22, 2017, MVH asked Gonzales to submit to an assessment by yet another medical provider, Alexander Mesrobian, MD.

107.     MVH violated Gonzales' rights under the MHRA and ADA by asking Gonzales to be seen by Dr. Mesrobian.

108.     This medical inquiry was not job-related and was not consistent with business necessity.

109.     MVH had opinions from multiple medical providers (Ms. Wilson, Dr. Smith, Dr. Bean, and Concentra) that Gonzales could perform the essential functions of his job and perform them safely.

110.     There was no medical basis for seeking an opinion about Gonzales' condition from yet another medical provider.

111.     MVH also violated Gonzales' rights under the FMLA by requiring a third opinion.  As set out above, a second opinion was not permitted much less a third opinion.

Furthermore, even when second opinions are permitted, third opinions not allowed unless "the opinions of the employee's and the employer's designated health care providers differ." 29 C.F.R. §825.307(c).

112.     Nonetheless, Gonzales agreed to be assessed, and was assessed, by Dr. Mesrobian on May 30, 2017.

113.     Dr. Mesrobian rendered his opinion to MVH on June 1, 2017.

114.     Dr. Mesrobian agreed with Ms. Wilson, Dr. Smith and Dr. Bean that Gonzales had a back impairment that was covered by the FMLA and that it was "very reasonable" for Gonzales to utilize FMLA to take time off for limited periods when he had a flare up.

115.     Dr. Mesrobian opined that other than Gonzales' need for intermittent leave, Gonzales did not need any specific restrictions concerning his job description at MVH.

116.     Upon information and belief, MVH did not want to continue Gonzales' employment because of Gonzales' back impairment but was unable to get a doctor to support its position.

117.     MVH reluctantly allowed Gonzales to return to work on June 12, 2017.

    MVH's Efforts to Push Gonzales Out and the Termination of his Employment

118.     After letting Gonzales return to work, MVH searched for an excuse to fire him.

119.     In fact, MVH had been treating Gonzales differently and unfairly since it learned about Gonzales' back impairment.

120.     On August 31, 2016, the day Gonzales returned to work after a doctor's appointment, MVH wrote Gonzales up for missing work in March and August 2016.

121.     When Gonzales arrived at work on August 31, 2016, he turned in FMLA certification forms to Human Resources. Dutton walked in and Gonzales asked Dutton what else

he needed to do to get back to work. Dutton said, "Hold on a second." Dutton went to his office

and returned with paperwork to discipline Gonzales for unscheduled absences.

122.    Gonzales told Dutton that MVH was treating him unfairly and discriminating

against him for taking time off for his back impairment.

123.    In February 2017, there was an influenza outbreak at MVH.

124.    On February 8, 2017, Gonzales went to Concentra with symptoms of the flu

which increased his back pain.

125.    Concentra released Gonzales to return to work and to see his PCP for follow up

care for his back.

126.    Gonzales went to work on February 9, 2017 but was sent home and told not to

return until he was seen by his PCP.

127.    On February 10, 2017, Ms. Wilson faxed a note to MVH stating that Gonzales

should be excused from work from February 9 through 17, 2017 due to back pain.

128.    Legendre asked Gonzales to get updated FMLA paperwork from his provider.

129.    Gonzales went to work on February 21, 2017 but was told to leave because MVH

policy states that an employee should not work for three days after starting Tamiflu.

130.    On February 21, 2017, Gonzales' medical provider faxed a note to MVH excusing

him from work through February 22, 2017.

131.    Even though MHV knew that Gonzales could not work on February 22, 2017,

Gonzales called the Nursing Supervisor as a courtesy, in case she was not told that he was going

to be absent.

132.    On March 14, 2017, Gonzales was called into a meeting with Legendre and

Dutton and told that he was being written up for calling out sick on February 22, 2017 fifteen

minutes after his shift started. Gonzales refused to sign the warning because it was so unfair. MVH knew in advance that Gonzales would not be at work on February 22.

133.    Gonzales asked Dutton what he needed to do to keep his job because it was clear they were trying to get rid of him because of his back condition.

134.    Instead of answering the question, Dutton went to his office and returned with another write up for insubordination in connection with Gonzales expressing concern about being written up and expressing concern for his job.

135.    Dutton told Gonzales that quite frankly, MVH did not want to accommodate his back condition. Legendre was present when Dutton said this.

136.    Dutton told Gonzales that if he did not like being reprimanded, then he needed to think if he wanted to continue working at MVH. Gonzales told Dutton that he was offended by what Dutton said, and that he (Gonzales) continued to work for MVH because he liked the job and cared about the residents.

137.    On March 15, 2017, Gonzales was placed on leave when he submitted an updated medical certification in spite of the fact that he was not currently experiencing a flare-up or unable to work. Despite the fact that Gonzales' own health care providers were clear that he could return to work and despite the fact that excluding Gonzales violated the explicit language of the FMLA Regulations, MVH excluded him from work for months.

138.    On March 20, 2017, after Gonzales was excluded from work by MVH, Gonzales reported to the Maine Department of Labor (DOL) that MVH was punishing him for his use of leave that is protected by Maine's FMLR and the FMLA.

139.    Maine DOL conducted an investigation into Gonzales' complaint and concluded that MVH violated the law by not providing Gonzales with a Notice of Eligibility, not providing

Gonzales with Notice of his Rights and Responsibilities, failing to provide designation notice in writing, for discriminating/disciplining Gonzales, and for refusing to reinstate Gonzales to his position (excluded from work).

140.    Maine DOL also noted that employers and their representatives are not allowed to ask for diagnoses, that attorneys are not listed as acceptable employer representatives to make contact with health care providers, and that nurse practitioners are approved health care providers under FMLA Regulations.

141.    MVH told Maine DOL that it refused to reinstate Gonzales because, according to MVH, Gonzales was unfit for the job.

142.    On May 5, 2017, Gonzales attended a conference at MVH with a Maine DOL Wage and Hour Investigator (WHI) Peck, Ms. Legendre, and an attorney for MVH.

143.    The WHI provided a general overview of the FMLA to MVH and explained to MVH its responsibilities under the FMLA.

144.    Legendre said she was not aware they were not providing notice correctly or designating leave in a timely manner. MVH agreed to remedy these violations by correcting the forms they used and to notify their main office as well.

145.    The WHI informed Peck and Legendre that the disciplinary actions it had taken against Gonzales had a discriminatory effect that may have discouraged Gonzales from exercising his FMLA rights and that directing Gonzales to call every one or two days while Gonzales was on leave exceeded MVH's own written policy as well as the law which states "an employer is not entitled to a certification of fitness to return to duty for each absence taken on an intermittent or reduced leave schedule."

146.    MVH told the WHI that Gonzales was a safety hazard to himself and possibly others.

147.    The WHI told MVH that this belief was not supported by the evidence provided and that there was no basis not to reinstate him immediately.

148.    The WHI presented back wages as a remedy and told MVH that they should reinstate Gonzales and restore leave benefits for the days he was forced out of work, and to remove disciplinary days from his record when he was exercising his rights in accordance with MVH's written policy.

149.    MVH offered to have a third opinion from a neutral health care provider be the deciding factor.

150.    The WHI told MVH that it had not followed the steps it needed to take to get a third opinion.

151.    On May 12, 2017, counsel for MVH sent a letter to Maine DOL rejecting its findings.

152.    As noted above, on May 22, 2017, MVH asked Gonzales to submit to a third assessment by yet another medical provider, Alexander Mesrobian, MD. Gonzales agreed to be assessed, and was assessed, by Dr. Mesrobian on May 30, 2017. Dr. Mesrobian rendered his opinion to MVH on June 1, 2017.

153.    On Wednesday, June 7, 2017, six days after MVH received Dr. Mesrobian's report supporting Gonzales' request for FMLA and stating that Gonzales was qualified to perform the essential functions of his job, Legendre gave Gonzales an agreement to settle his complaint to Maine DOL.

154.    MVH offered Gonzales three months of pay to resign.

155.     Gonzales rejected the offer.

156.     On Friday, June 9, 2017, Legendre called Gonzales and asked if he had made a decision about signing the severance agreement.

157.     Gonzales told Legendre that he was not going to sign it and that his lawyer would be contacting MVH.

158.     In a text message sent later that day, Legendre told Gonzales to report for work on Monday, June 12, 2017 at 7 AM.

159.     When Legendre asked Gonzales to return to work on short notice, Gonzales had already made plans to drop his wife off at the airport in Boston on Tuesday, June 13, 2017.

160.     Gonzales made alternate arrangements for his wife but those arrangements fell through at the last minute.

161.     As soon as Gonzales learned that the alternate plan fell through, Gonzales asked Preo for time off.

162.     Preo approved the request and asked Gonzales to enter it into the computer.

163.     Gonzales had difficulty logging on and did not, in the end, take the day off.

164.     The next day, Tuesday, June 13, 2017, Gonzales was given a final counseling for allegedly talking to co-workers negatively about MVH, allegedly not following safety and security protocols, and allegedly not following proper procedure or chain of command for requesting time off.

165.     Gonzales met with Preo, Peck and Legendre to discuss the counseling.

166.     Gonzales refused to sign the write-up because it was unfair and retaliatory.

167.     The following day, June 14, 2017, Gonzales wrote a letter to MVH with his rebuttal to the write up.

168.     Gonzales also informed MVH that he was wrongfully accused of violating policies and rules due to retaliation.

169.     On July 5, 2017, Gonzales met with Preo and Legendre and they handed him an annual review that was apparently prepared in April 2017. Gonzales disagreed with the evaluation and refused to sign it.

170.     On July 5, 2017, Gonzales was also disciplined for not completing an in-service training on fire safety essentials by June 30, 2017.

171.     Gonzales refused to sign because the write-up was unfair and discriminatory.

172.     During fourteen weeks prior to June 30, 2017, Gonzales had been excluded from work by MVH because of his back impairment. During that fourteen week period, Gonzales was not able to access the MVH computer, he was locked out of the system and unable to complete in-service training.

173.     Gonzales was fired on July 13, 2017.

174.     That morning, Gonzales was called into a meeting with Preo, Peck and Legendre.

175.     Gonzales was told that he was not completing his share of work orders.

176.     Gonzales explained that others were finishing work that he (Gonzales) started and/or closing work orders that Gonzales finished making it look like they did the work.

177.     Gonzales gave an example of this. While Gonzales was hanging pictures on the wall for a resident, the resident's granddaughter walked in for a visit so Gonzales left to avoid disturbing them.

178.     Gonzales moved on to the next job, and the next, and then returned to finish hanging pictures.

179.     By the end of the day all of Gonzales' projects were finished.

180.     Gonzales was accused of taking the company truck and leaving the property for three hours.

181.     Gonzales denied this and explained why he left, where he went, what he did, who he notified, and how long he was gone.

182.     Gonzales explained that one of the residents is a smoker and needed to have his equipment attached to his wheelchair. Gonzales was asked to find a solution.

183.     Gonzales went to two different hardware stores to find parts and got ideas for how to build a bracket from both stores.

184.     Before Gonzales left MVH, he called the receptionist to let her know he was leaving the premises.

185.     Gonzales was only gone for one hour.

186.     When Gonzales returned to MVH, he built a bracket and was pleased to have found a solution that did not alter the wheelchair.

187.     Gonzales was disappointed to find that in his absence, someone else had drilled holes in the wheelchair.

188.     Gonzales was asked about going into a supervisor's office (Michelle Sawyer's) to get a piece of paper.

189.     Ms. Sawyer apparently reported that she was concerned about Gonzales seeing confidential medical records when he went in her office.

190.     There were no medical records on Ms. Sawyer's desk when Gonzales retrieved the permission slip

191.     Gonzales explained why he went into Ms. Sawyer's office. Briefly, he told Preo, Peck and Legendre that D.W. asked Gonzales to get the permission slip back. D.W. was seeking

permission to hang a bearskin on a wall shared with another resident. The permission slip needed to be signed by D.W., the other resident, and a supervisor. D.W. asked Gonzales to retrieve the permission slip so that he could have supervisor Mary Hagen sign it. Ms. Sawyer was not available so Gonzales went into her office, retrieved the paper, and gave it to Ms. Hagen. Gonzales told the managers that all he did was follow instructions from others.

192.    Gonzales was told that there were reports from employees that Gonzales was harassing them and that they hid from Gonzales to avoid being harassed. No names or examples were given. Gonzales denied that he harassed anyone and told managers that he behaved normally with everyone.

193.    Gonzales was told that they had received reports from more than one employee that Gonzales was trying to get fired. No names were given.

194.    Gonzales told the managers that if he was trying to get fired he would stop showing up for work and stop doing his job.

195.    Gonzales told managers that he knew that he was on thin ice with them and that while he was trying his best to do what he was supposed to do, he was waiting and expecting them to get rid of him.

196.    At lunchtime, Gonzales went to the hardware store to get copies of the receipts for proof of when he was at the store.

197.    When Gonzales got back from lunch, he was called into another meeting with Preo and Peck.

198.    The meeting only lasted for three minutes.

199.    Peck said, as of right now you are terminated.  Gonzales said, what?  Peck said yes, you're out.

200.    Gonzales pulled out the receipts from the Paris Farmers' Union hardware store and told Preo and Peck that the receipts were proof that he (Gonzales) was not been gone from the facility for three hours, he was only gone for less than an hour.

201.    Peck snatched the receipts from Gonzales, folded them up, put them in his pocket and said, "This is MVH property."

202.    Peck then escorted Gonzales to the door.

203.    The receipts that Peck took from Gonzales contain evidence that help prove that the reason given for firing Gonzales was pretextual.

204.    Upon information and belief, MVH closed its account with the hardware store.

205.    After Gonzales was fired, his counsel asked MVH for a written statement of its reason for terminating Gonzales' employment.

206.    Legendre responded with a letter dated August 4, 2017. She wrote that Gonzales was terminated on July 13, 2017 because of (a) gross insubordination, (b) failure to perform his work appropriately, (c) continuously interrupting and harassing fellow employees and preventing them from doing their work when they had asked him not to, (d) refusing to comply with a Company safety rule, (e) intentionally being absent from work when he was supposed to be working, and (f) inadequate performance of his duties.

207.    MVH also produced a copy of Gonzales' personnel file which contained evidence that managers had gathered statements from employees in early July 2017 for the purpose of justifying his termination.

208.    There are no employee statements in Gonzales' file prior to July 2017.

209.    MVH did not explain what constituted "gross insubordination."

210.    MVH may be referring to the March 13, 2017 write-up in which Gonzales was accused of being insubordinate.

211.    That write-up was issued after MVH learned of Gonzales' disability/serious health condition, after Gonzales requested FMLA, and after Gonzales reported MVH to the Maine DOL for violating his rights.

212.    The write-up was based on incidents that allegedly occurred one to eight months before the write-up was issued.

213.    Nothing was said or done about his alleged misconduct at the time it occurred.

214.    More importantly, Gonzales was never "accusatory" or "disrespectful" toward managers.

215.    Gonzales protested when he was treated unfairly and subjected to discrimination and retaliation but he was always professional.

216.    MVH did not explain how Gonzales allegedly "failed to perform his work appropriately" or what is meant by "inadequate performance of his duties."

217.    Gonzales' 90-day appraisal rated his job performance as satisfactory in all respects. Gonzales' first and second annual performance appraisals rated him as "fully meets expectations" with regard to the performance of tasks.

218.    One of the statements MVH gathered from employees in early July 2017 was written by M.C., who reported that she was annoyed that Gonzales "kept putting off a job he was supposed to do for us."

219.    Gonzales was not asked about this allegation while he was employed.

220.    The job that M.C. was referring to was removing a phone and putting up a bulletin board. That job was delayed because Gonzales was busy doing tasks that had been neglected while Gonzales was forced out of work on medical leave.

221.    When Gonzales returned, he had to prioritize tasks that addressed conditions that posed a safety hazard (like cleaning dryers in the laundry room, drains in the kitchen, and replacing lights throughout the building) over less pressing tasks, like hanging a bulletin board.

222.    MVH did not explain or give examples of what it meant by claiming that Gonzales continuously interrupted and harassed fellow employees and prevented them from doing their work.

223.    MVH may be referring to M.C., a co-worker who was asked to write a statement about Gonzales just before he was fired. M.C. reported that Gonzales was constantly bothering her and trying to get her to smile.

224.    M.C. also reported that she never told Gonzales that he was making her uncomfortable and that she wanted him to stop.

225.    MVH may be referred to D.W., another co-worker who was asked to write a statement about Gonzales before he was fired.

226.    D.W. reported that Gonzales stopped several times a day "to be negative" instead of working.

227.    It is true that Gonzales told co-workers that he was being mistreated by MVH but it did not stop him or others from performing their jobs.

228.    MVH did not explain or give examples of Gonzales being "intentionally absent from work" when he was supposed to be working.

229.     Gonzales believes that this refers to his trip to the hardware store as described above.

230.     Gonzales left work on July 13, 2017 on a work-related errand to the hardware store. Gonzales let the receptionist know that he was leaving. Gonzales provided receipts for the purchase he made to Peck as proof that he was gone for only one hour. Peck took the receipts and fired Gonzales anyway.

231.     Gonzales worked for MVH for more than twelve months and worked more than 1,250 hours in the twelve months preceding his requests for and use of medical leave.

232.     MVH employed more than 15 employees at its South Paris facility at all times material to this case for purposes of the FMLR.

233.     Gonzales' back condition was a serious health condition for purposes of the FMLA and FMLR.

234.     Gonzales' back condition substantially limited major life activities including working during a flare up and when viewed in the absence of mitigating measures.

235.     Gonzales' back condition also substantially limited the functioning of a major bodily system, his orthopedic system, particularly when viewed during a flare up and in the absence of mitigating measures.

236.     Gonzales' back condition significantly impaired his health, particularly when viewed during a flare up and when viewed in the absence of mitigating measures.

237.     Gonzales' back condition was a disability for purposes of the ADA, MHRA, and the Rehab Act.

238.     MVH regarded Gonzales as a person with a disability for purposes of the ADA, MHRA, and the Rehab Act.

239.    MVH regarded Gonzales as a person with a physical impairment for purposes of the MHRA.

240.    MVH violated the MHRA, ADA and the Rehab Act by making unlawful medical inquiries.

241.    MVH violated the MHRA, ADA and the Rehab Act by excluding Gonzales from work for 14 consecutive weeks due to disability discrimination.

242.    MVH fired Gonzales due to disability discrimination in violation of the MHRA, ADA and the Rehab Act.

243.    MVH fired Gonzales because he requested and needed reasonable accommodations in violation of the MHRA, ADA and the Rehab Act.

244.    MVH violated the WPA by firing Gonzales because he reported to the Maine DOL that MVH violated his rights under the FMLA/FMLR and because Maine DOL forced MVH to take corrective action.

245.    MVH violated the MHRA, ADA and the Rehab Act by firing Gonzales because he complained about retaliation.

246.    MVH violated Gonzales' rights under the FMLA/FMLR and fired him because he requested and needed protected leave.

247.    Timing provides a causal nexus between Gonzales' membership in protected classes and his termination.

248.    Timing provides a causal nexus between Gonzales' protected activity and his termination.

249.    Statements made to and about Gonzales by Tabb, Legendre, Dutton, Peck and Preo evidenced a discriminatory animus toward Gonzales including but not limited to Dutton's

statement that MVH did not want to accommodate Gonzales' back condition, statements about Gonzales' alleged inability to perform his job duties safely, and MVH's effort to persuade Gonzales to accept a voluntary severance.

250.    The reasons given by MVH for firing Gonzales are pretextual.

251.    MVH knowingly and willfully violated Gonzales' rights under the ADA, MHRA, Rehab Act, FMLA and MFMLR.

252.    MVH unlawfully discriminated against Gonzales with malice or reckless indifference to his rights.

253.    As a result of MVH's unlawful discrimination against Gonzales, he has suffered lost wages, lost benefits, loss of enjoyment of life, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

254.    Gonzales has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his treatment by MVH unless and until MVH is enjoined by this court.

## COUNT I: MHRA
## UNLAWFUL DISCRIMINATION

255.    Paragraphs 1-254 are incorporated by reference.

256.    MVH's conduct constitutes unlawful disability discrimination against Gonzales in violation of the MHRA.

## COUNT II: MHRA
## FAILURE TO ACCOMMODATE

257.    Paragraphs 1-256 are incorporated by reference

258.    MVH violated the MHRA by failing to provide Gonzales with reasonable accommodations for his disability.

## COUNT III: MHRA
## UNLAWFUL RETALIATION

259.     Paragraphs 1-258 are incorporated by reference.

260.     MVH violated the MHRA by retaliating against Gonzales because he required

and used emergency medical leave as a reasonable accommodation for his disability.

## COUNT IV: ADA
## UNLAWFUL DISCRIMINATION

261.     Paragraphs 1-260 are incorporated by reference.

262.     MVH's conduct constitutes unlawful discrimination against Gonzales in violation

of the ADA.

## COUNT V: ADA
## FAILURE TO ACCOMMODATE

263.     Paragraphs 1-262 are incorporated by reference.

264.     MVH violated the ADA by failing to provide Gonzales with reasonable

accommodation for his disabilities.

## COUNT VI: ADA
## UNLAWFUL RETALIATION

265.     Paragraphs 1-264 are incorporated by reference

266.     MVH violated the ADA by retaliating against Gonzales because he required and

used emergency medical leave as a reasonable accommodation for his disability.

## COUNT VII: REHAB ACT
## UNLAWFUL DISCRIMINATION

267.     Paragraphs 1-266 are incorporated by reference.

268.     MVH's conduct constitutes unlawful discrimination against Gonzales in violation

of the Rehab Act.

## COUNT VIII: REHAB ACT

FAILURE TO ACCOMMODATE

269.     Paragraphs 1-268 are incorporated by reference.

270.     MVH violated the Rehab Act by failing to provide Gonzales with reasonable

accommodation for his disability.

COUNT IX: REHAB ACT
UNLAWFUL RETALIATION

271.     Paragraphs 1-270 are incorporated by reference.

272.     MVH violated the Rehab Act by retaliating against Gonzales because he required

and used emergency medical leave as a reasonable accommodation for his disability.

COUNT X: WPA
UNLAWFUL RETALIATION

273.     Paragraphs 1-272 are incorporated by reference.

274.     MVH's conduct constitutes unlawful retaliation and discrimination against

Gonzales in violation of the WPA as enforced through the MHRA.

COUNT XI: FMLA

275.     Paragraphs 1-274 are incorporated by reference.

276.     MVH violated Gonzales' prescriptive and proscriptive rights under the FMLA.

COUNTY XII: FMLR

277.     Paragraphs 1-276 are incorporated by reference.

278.     MVH violated Gonzales' prescriptive and proscriptive rights under the FMLR.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award liquidated damages in an amount to be determined at trial;

I. Award penalties at a rate of $100 per day for the period that Defendant is in violation of the FMLR;

J. Award nominal damages;

K. Award attorney's fees, including legal expenses, and costs;

L. Award prejudgment interest;

M. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability, family medical leave, or retaliation;

N. Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

O. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

P. Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA, WPA, FMLR, FMLA and the Rehab Act;

Q.     Require that Defendant place a document in Plaintiff's personnel file which

explains that Defendant unlawfully terminated him because of discrimination and retaliation; and

R.     Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  June 12, 2018                                  */s/* Chad T. Hansen

Attorney for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
chansen@maineemployeerights.com